1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>     v.<br><br>THANJAVUR MANAVALAN,<br><br>              Defendant. | CASE NO. 2:23-cr-00192-LK<br><br>ORDER DENYING MOTION TO SUPPRESS STATEMENTS TO LAW ENFORCEMENT AND GRANTING IN PART AND DENYING IN PART MOTION TO EXCLUDE EMBEDDED ALLEGATIONS |

This matter comes before the Court on pretrial motions filed by Defendant Thanjavur Manavalan seeking to (1) suppress all statements he made to law enforcement officers on June 8, 2021, Dkt. No. 40, and alternatively, to (2) exclude "embedded allegations" in questions posed by the interviewing agents, Dkt. No. 48. The Government opposes both motions in a combined response. Dkt. No. 58. For the reasons set forth below, the Court denies the motion to suppress statements to law enforcement and grants in part and denies in part the motion to exclude embedded allegations.

# I.    BACKGROUND

**A.    IRS Agents Interviewed Manavalan on June 8, 2021**

On June 8, 2021, IRS Criminal Investigation agents executed a search warrant at Manavalan's residence and his tax preparation business—located in the basement of his home—in Bellevue, Washington. Dkt. No. 46 at 3–4; *see also* Dkt. No. 40 at 2. According to Manavalan, he was "confronted" at his front door by numerous armed agents, one of whom "was holding a gun in his hand," and handed a search warrant. Dkt. No. 40 at 3. Multiple agents entered the home. Dkt. No. 40-1 at 2–3.

Manavalan also saw "several uniformed police officers standing in the driveway of [his] residential office," watching him, and he "did not believe that [he] could just walk away." Dkt. No. 46 at 4. Manavalan's wife and son were upstairs in the home, *id.*; Dkt. No. 42-2 at 2, and agents took Manavalan's employee to a second floor raised deck with chairs and ground-level access via a staircase, Dkt. No. 40 at 2; Dkt. No. 40-3 at 2 (picture of three people seated on the deck, apparently in discussions).

Meanwhile, IRS Special Agents Christopher Schneider and Joe Lopez took Manavalan to "a small room"—approximately 10 by 12 feet in size—with one door. Dkt. No. 46 at 4. According to Manavalan, the agents closed the door and sat between Manavalan and the door. *Id.* The Government avers that the office door was ajar for at least part of the interview, as depicted in a video of the premises, and the interview room "presumably" was the office of one of Manavalan's employees. Dkt. No. 58 at 2–3.

At the start of the interview, Agent Schneider told Manavalan that "as I told you before, you're not under arrest. You're not in custody. You're free to come and go and free to answer these questions, but it's my duty to read you these rights." Dkt. No. 40-4 at 2. Agent Schneider

next asked Manavalan to put his phone on silent. *Id.* Agent Schneider then restarted his warnings, telling Manavalan:

- "You're not in custody, and you're free to come and go at any time, and you can stop, decide to stop answering questions if you'd like." *Id.*

- "But your rights are, as a special agent, one of my functions is to investigate possibility of criminal violations of the internal revenue laws and related offenses. In connection with my investigation of your tax liability or other matter, I would like to ask you some questions." *Id.*

- "[F]irst, I advise you that under the Fifth Amendment of the Constitution of the United States, I cannot compel you to answer any questions or to submit any information if such answers or information might tend to incriminate you in any way. I also advise you that anything which you say and any documents which you submit may be used against you in any criminal proceedings which may be undertaken. I advise you further that you may, if we, if you wish, seek the assistance of an attorney before responding." *Id.* at 2–3.

Agent Schneider asked whether Manavalan understood his rights, and Manavalan responded, "Yeah." *Id.* at 3. Agent Lopez also asked Manavalan if he understood his rights, and said,

> You don't have to talk to us if you don't want to, but we're asking you to cooperate with us and to answer questions that we have. And if at any point you feel uncomfortable, just say, no, I don't want to answer any more questions. You know, so you could tell us that if you want. But like I said, cooperation goes a long way. So if you cooperate with us and you answer questions that [Agent Schneider] asks you, then it just helps, you know.

*Id.* Again, Manavalan responded, "Yeah." *Id.*

When Agent Lopez asked Manavalan if he understood what was going on, Manavalan responded, "A little bit." *Id.* at 8. He further stated that he understood that the agents worked for the IRS, they were criminal investigators, the situation involved a criminal matter, and they were there "taking the documentation, business [inaudible] documentation." *Id.* at 8–9. When Manavalan asked for an explanation of the kind of criminal matter the agents were investigating, Agent Schneider explained that they

> ha[d] information that states that you're, you know, you're putting expenses and you're fabricating losses on tax returns that people aren't entitled to to decrease

1    their tax liability. So that's the short and sweet of it. But, you know, I've got some
2    additional questions for you where we can walk through them and then you can
     kind of answer. And then once we get to those, you can tell us about that. Does that
3    sound good?

4    *Id.* at 9–10. Manavalan responded, "Okay. Yeah." *Id.* at 10. Manavalan denied that he inflated his

5    clients' expenses. *Id.* at 37–40.

6            The first part of the interview lasted from 11:11 a.m. to 12:33 p.m., at which time the agents

7    took a restroom break. *Id.* at 2, 56. The interview reconvened at 12:42 p.m., at which point Agent

8    Schneider reminded Manavalan that "like we said, you're free to, free to go. You can stop

9    answering any questions at any time. But would you like to continue questions? Okay. Okay," Dkt.

10   No. 40-5 at 2, and continued the questioning for approximately 19 minutes, *id.* at 9.

11   **B.      Manavalan Was Indicted**

12           In December 2023, Manavalan was indicted on 14 counts of Aiding and Assisting in the

13   Preparation and Presentation of a False and Fraudulent Return in violation of 26 U.S.C. § 7206(2).

14   Dkt. No. 1 at 1–3. The Government alleges that between April 2019 and April 2021, Manavalan

15   aided and assisted 13 taxpayers with filing false and fraudulent returns. *See id.* at 1–2.[1]

16   Specifically, the returns "represented that the taxpayers were entitled under the provisions of the

17   Internal Revenue laws to claim deductions for items and in amounts specified" in the Indictment,

18   even though Manavalan "knew[] the taxpayers were not entitled to claim deductions in the claimed

19   amounts[.]" Dkt. No. 1 at 1–2. The alleged scheme resulted in "reduction of the taxpayer's taxable

20   income and the taxpayer receiving credits for which they were ineligible." *Id.* Trial is scheduled

21   to begin on January 20, 2026. Dkt. No. 36.

22

23

24   ---
     [1] Before trial, the Government moved to dismiss counts 13 and 14 related to taxpayer D.Y., and the Court granted that unopposed motion. Dkt. Nos. 67–68.

ORDER DENYING MOTION TO SUPPRESS STATEMENTS TO LAW ENFORCEMENT AND GRANTING IN PART AND DENYING IN PART MOTION TO EXCLUDE EMBEDDED ALLEGATIONS - 4

## II.   DISCUSSION

Parties may move "to exclude anticipated prejudicial evidence before the evidence is actually offered," *Luce v. United States*, 469 U.S. 38, 40 n.2 (1984), and the Court enjoys "wide discretion in determining the admissibility of evidence," *United States v. Abel*, 469 U.S. 45, 54 (1984). The Court may amend, renew, or reconsider its rulings on pretrial motions in response to developments at trial. *Luce*, 469 U.S. at 41–42.

### A.     The Scope of the Record

Local Criminal Rules 12(b)(1) and (2) require parties to "file copies of all affidavits and photographic or documentary evidence presented in support of" the motion or opposition when "consideration of facts not appearing of record" is required. *See also Cohen v. United States*, 378 F.2d 751, 761 & n.21 (9th Cir. 1967) ("[T]he court has inherent power to require that supporting affidavits be filed."). Despite that obligation, Manavalan's motion to suppress statements includes paragraphs of facts without citation to the record and cites to exhibits that are not attached to a declaration or otherwise authenticated. Dkt. No. 40 at 2–3; Dkt. Nos. 40-1–40-6. The Government's response provides citations to the record, *see generally* Dkt. No. 58, but it does not attach its exhibits to a declaration either, Dkt. Nos. 58-1, 58-2.

The Court does not consider as facts assertions that are unsupported by any citation or exhibit, such as the assertion that Manavalan was "scared" during the interview. Dkt. No. 40 at 3. And although in this instance the Court will consider the parties' exhibits, the undisputed facts, and Manavalan's declarations, it cautions that it will not consider facts that are not properly supported in the future, and may impose sanctions for continuing violations of the Local Criminal Rules.

1    **B.      The Court Denies the Motion to Suppress Statements**

2          The Fifth Amendment provides: "No person . . . shall be compelled in any criminal case to

3    be a witness against himself[.]" U.S. Const. amend. V. In *Miranda v. Arizona*, the Supreme Court

4    held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming

5    from custodial interrogation of the defendant unless it demonstrates the use of procedural

6    safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966).

7    Those safeguards include specific warnings and advisements. *Id.* at 444–45.

8          Manavalan argues that the Court should suppress the statements he made to the IRS agents

9    on June 8, 2021 because he was in custody for *Miranda* purposes during the interview, the agents

10   gave defective *Miranda* warnings, he did not knowingly and intelligently waive his rights, and his

11   statements were involuntary under the Fifth Amendment. Dkt. No. 40 at 3–14. The Government

12   concedes that Manavalan was not provided complete *Miranda* warnings, but argues that those

13   warnings were not required because he was not in custody and his statements were voluntary. Dkt.

14   No. 58 at 7.

15         1.    Manavalan Was Not in Custody

16         Manavalan contends that although the agents told him he was free to leave, "the

17   surrounding circumstances contradicted their assurance." Dkt. No. 40 at 3. He argues that the IRS

18   agents "isolated [him] from his family, confined him in a small room, blocked his exit, and

19   subjected him to accusations of guilt and interrogation, which lasted more than 90 minutes—three

20   times longer than in *Craighead*." *Id.* at 4 (citing *United States v. Craighead*, 539 F.3d 1073 (9th

21   Cir. 2008)). Manavalan also states that he immigrated to the United States in 1998, and speaks

22   English "only as [a] second language." *See* Dkt. No. 46 at 6.

23         The Government responds that Manavalan was not in custody: he "was interviewed in an

24   office in his home, out of the way of the team searching his house," he was "unequivocally advised

1   at least three times during the recorded interview—twice in its first two minutes—that he was free

2   to come and go," "[h]e took a nine-minute break and, after another reminder that he was free to go

3   and stop answering questions, voluntarily recommenced the interview." Dkt. No. 58 at 6.

4       A "custodial interrogation" includes "questioning initiated by law enforcement officers

5   after a person has been taken into custody or otherwise deprived of his freedom of action in any

6   significant way." *Miranda*, 384 U.S. at 444; *see also Howes v. Fields*, 565 U.S. 499, 509 (2012)

7   (explaining that a defendant is in custody for *Miranda* purposes if "in light of the objective

8   circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty

9   to terminate the interrogation and leave" (citation modified)). "To determine whether the suspect

10  was in custody, [courts] first examine the totality of the circumstances surrounding the

11  interrogation." *Craighead*, 539 F.3d at 1082. Next, courts "ask whether a reasonable person in

12  those circumstances would 'have felt he or she was not at liberty to terminate the interrogation and

13  leave.'" *Id.* (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). "Relevant factors include

14  the location of the questioning, its duration, statements made during the interview, the presence or

15  absence of physical restraints during the questioning, and the release of the interviewee at the end

16  of the questioning." *Howes*, 565 U.S. at 509 (citations omitted).

17      An interrogation inside a suspect's own home presents "unique[]" challenges because a

18  person cannot return home to "the most constitutionally protected place on earth"—he is already

19  there—and "a reasonable person interrogated inside his own home may have a different

20  understanding of whether he is truly free 'to terminate the interrogation' if his home is crawling

21  with law enforcement agents conducting a warrant-approved search." *Craighead*, 539 F.3d at

22  1083. At the same time, "[a]n interrogation conducted within the suspect's home is not *per se*

23  custodial," and "courts have generally been much less likely to find that an interrogation in the

24  suspect's home was custodial in nature" because the element of compulsion that concerned the

1    Court in *Miranda* is less likely to be present when "the suspect is in familiar surroundings." *Id.*

2    Accordingly, "when applying *Miranda* to the task of sorting a non-custodial in-home interrogation

3    from a custodial one, [a court's] analysis considers the extent to which the circumstances of the

4    interrogation turned the otherwise comfortable and familiar surroundings of the home into a

5    'police-dominated atmosphere.'" *Id.*

6         The extent to which a home has been transformed into a police-dominated atmosphere is a

7    "fact intensive" inquiry involving consideration of the following factors:

8           (1) the number of law enforcement personnel and whether they were armed;
       (2) whether the suspect was at any point restrained, either by physical force or by

9           threats; (3) whether the suspect was isolated from others; and (4) whether the
       suspect was informed that he was free to leave or terminate the interview, and the

10          context in which any such statements were made.

11   *Id.* at 1084. Courts also consider traditional factors to determine if an individual is in custody,

12   including: "(1) the language used to summon the individual; (2) the extent to which the defendant

13   is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the

14   duration of the detention; and (5) the degree of pressure applied to detain the individual." *United*

15   *States v. Brobst*, 558 F.3d 982, 995 (9th Cir. 2009) (citation modified); *see also Howes*, 565 U.S.

16   at 509.

17        The Court turns first to "the totality of the circumstances surrounding the interrogation."

18   *Craighead*, 539 F.3d at 1082. Here, unlike in *Brobst*, 558 F.3d at 995, Manavalan does not contend

19   that the agents summoned him to the interview with language indicating that he was in custody.

20   *See generally* Dkt. No. 46.

21        Manavalan avers that the search warrant was executed by "[t]wo special agents and up to

22   a dozen armed officers," Dkt. No. 40 at 2, so "more officers were present than [the eight] in

23   *Craighead*," *id.* at 4. However, in *Craighead*, the Court took special note of unique circumstances:

24   the defendant was a member of the military—as were many of the officers who came to question

1    him; one of the officers was "Craighead's Air Force superior," *Craighead*, 539 F.3d at 1085; and

2    some of the law enforcement personnel "unholstered their firearms in Craighead's presence," *id.*;

3    *see also United States v. Quackenbush*, 728 F. App'x 777, 778 (9th Cir. 2018) (distinguishing the

4    interview environment there because "it did not have the military undertone present in

5    *Craighead*"). Here, Manavalan was not a member of the military and there is no allegation that the

6    interview had the military undertone or unique circumstances present in *Craighead*. *See*

7    *Quackenbush*, 728 F. App'x at 778. Although he states that "[a]t least one agent was holding a gun

8    in his hand" when Manavalan opened his front door, Dkt. No 46 at 3, he does not aver that agents

9    unholstered their weapons during the interview or at any point during the search.

10        Additional factors suggest that Manavalan was not restrained. Manavalan does not contend

11    that he was handcuffed, subjected to the use of physical force, or otherwise physically restrained.

12    *See generally id.* Manavalan avers that the two interviewing IRS agents "sat in chairs between

13    [him] and the door to the [interview] room," *id.* at 4, but he does not allege that he was unable to

14    walk around them, that he asked to leave the room, or that he wanted to leave the room. And "the

15    number and appearance of the officers involved in the questioning here made the interview less

16    imposing than the one in *Craighead*"; here, only two officers were involved in questioning and the

17    officers' firearms were not drawn, whereas officers involved in the interview in *Craighead*

18    unholstered their weapons at various points. *See Quackenbush*, 728 F. App'x at 778 (making

19    similar distinctions in finding that an interview was non-custodial). Although Manavalan notes

20    that he was isolated from his family and "confined . . . in a small room" with the door closed, Dkt.

21    No. 40 at 2, 4, he was interviewed in a windowed room in his own home that he described as part

22    of "[his] office," Dkt. No. 46 at 4. *See* Dkt. No. 58-2 at 2–3; Dkt. No. 40-5 at 4 (Manavalan noting

23    that he "did this, the whole office setup here"); *see also Quackenbush*, 728 F. App'x at 778

24    (distinguishing *Craighead*, where the suspect "was interviewed in a dark storage room at the back

of his house"); *United States v. Bassignani*, 575 F.3d 879, 885 (9th Cir. 2009) (noting that a conference room within the suspect's workplace was "plainly a familiar environment"). And as the Government notes, Manavalan "never asked to speak with his family (or anyone else)" during the interview, Dkt. No. 58 at 10, and he does not contend that any of his family members attempted to sit in on the interview. Moreover, a break of approximately nine minutes was taken during the interview, Dkt. No. 40-4 at 56; Dkt. No. 40-5 at 2, and Manavalan does not contend that the agents monitored him, limited his movements, or escorted him anywhere during that break. *See United States v. Acosta-Licerio*, 756 F. App'x 743, 744 (9th Cir. 2019) (finding that defendant was not in custody where he "was interviewed in his home and the surrounding area by only two law enforcement agents with no visible weapons, [he] was not restrained by physical force or by threats, and to the extent he was isolated from others, the record indicates that he chose to speak with the agents alone"); *cf. United States v. Mittel-Carey*, 493 F.3d 36, 40 (1st Cir. 2007) (finding an interrogation custodial when the suspect "was escorted by agents on the three occasions that he was permitted to move, including while he used the bathroom").[2]

Although the agents told Manavalan that "cooperation goes a long way," Dkt. No. 46 at 5; Dkt. No. 40-4 at 3, he does not contend that he was threatened into answering questions. Nor does the recording reveal a coercive interrogation. Manavalan asserts that he was subjected to "accusations of guilt and interrogation, which lasted more than 90 minutes[.]" Dkt. No. 40 at 4. Manavalan seems to be stating that the interview lasted more than 90 minutes—which is supported by the record—rather than asserting that he was subjected to 90 minutes of accusations of guilt, which is not supported. On that point, the record shows that the agents asked Manavalan the first accusatory question approximately 47 minutes into the interview, and Manavalan readily denied

---

[2] In addition, in *Mittel-Carey*, the suspect was "awakened at 6:25 AM by law enforcement officers (one with an unholstered gun)," 493 F.3d at 40, while Manavalan was questioned in the middle of the day, Dkt. No. 40-4 at 2.

1   the accusation. Dkt. No. 40-4 at 39–40. Although at that point and elsewhere the agents confronted

2   Manavalan with evidence of his guilt, *id.*, Manavalan does not assert that the agents said anything

3   deceptive. Nor does the length of the interview support a finding of custody under these

4   circumstances. *See Bassignani*, 575 F.3d at 886 (noting that courts "have found a defendant not in

5   custody" when they were interrogated for "approximately 45 minutes" and "more than one hour,"

6   but another suspect was found to have been in custody "when she was interrogated for 45 to 90

7   minutes" (citation modified)); *see also, e.g.*, *United States v. Remy*, 393 F. App'x 427, 429 (9th

8   Cir. 2010) (agreeing with the district court that defendant was not in custody in light of the "in-

9   home questioning, [his] telephonic contact with his wife during the interview, the presence of only

10  two agents, the agents did not show their weapons, and a two hour interview"). Notably, here, the

11  interview "was not a marathon session designed to force a confession[.]" *Id.* Rather, reviewing the

12  entire recording, the "overall tenor of the interrogation was not coercive." *Id.* at 887; *see also id.*

13  at 884 (noting that "nearly the entire two and a half hour interview was conducted in an open,

14  friendly tone").

15      Manavalan contends that he thought he had to remain in the room with the agents and

16  "answer their questions," Dkt. No. 46 at 4, but the inquiry is an objective one; the key question is

17  whether a reasonable person would have felt free to leave, *Thompson*, 516 U.S. at 112; *see also*

18  *Bassignani*, 575 F.3d at 883 ("The custody determination is objective and is not based upon the

19  subjective views of . . . the individual being questioned" (citation modified)). On this issue, "[i]f a

20  law enforcement officer informs the suspect that he is not under arrest, that statements are

21  voluntary, and that he is free to leave at any time, this communication greatly reduces the chance

22  that a suspect will reasonably believe he is in custody." *Craighead*, 539 F.3d at 1085; *see also*

23  *Bassignani*, 575 F.3d at 886 ("We have consistently held that a defendant is not in custody when

24  officers tell him that he is not under arrest and is free to leave at any time."). Here, the agents

ORDER DENYING MOTION TO SUPPRESS STATEMENTS TO LAW ENFORCEMENT AND GRANTING IN
PART AND DENYING IN PART MOTION TO EXCLUDE EMBEDDED ALLEGATIONS - 11

informed Manavalan multiple times that "free to come and go at any time," and to "decide to stop answering questions" if he chose. Dkt. No. 40-4 at 2; *see also id.* (Agent Schneider informing Manavalan that he was not under arrest, not in custody, "free to come and go and free to answer these questions"); *id.* at 2–3 (Agent Schneider stating that he "cannot compel [Manavalan] to answer any questions or to submit any information if such answers or information might tend to incriminate [him] in any way," and that Manavalan could "seek the assistance of an attorney before responding"). Moreover, after a nine-minute break, the agents told Manavalan again that he could "stop answering any questions at any time," but he continued with the interview. Dkt. No. 40-5 at 2; *see also Quackenbush*, 728 F. App'x at 779 (noting in finding interview non-custodial that the agent "told [defendant] he was not under arrest, was free to leave, and did not need to answer questions").

Manavalan's attempts to equate his circumstances with those in *Craighead* are unavailing considering the distinguishing facts discussed above. Manavalan "has pointed to no evidence suggesting that his 'will was overborne' when he made his statements to law enforcement." *Acosta-Licerio*, 756 F. App'x at 744 (quoting *United States v. Miller*, 984 F.2d 1028, 1030–31 (9th Cir. 1993)). Rather, the record establishes that he freely volunteered information to the agents, and responded in the affirmative when an agent asked, "Do you understand these rights?" Dkt. No. 40-4 at 3.[3] Considering the totality of the circumstances, the Court finds that the factors weigh in favor of the conclusion that a reasonable person in Manavalan's position would have felt free to leave.

---

[3] Although Manavalan states that English is his second language, Dkt. No. 46 at 6, he does not aver that he failed to understand what the agents told him, *see generally* Dkt. No. 46. Moreover, as the Government notes, at the time of the interview, Manavalan "had lived in the United States for over two decades and spent almost all of that time filing tax returns in English," he "has submitted several declarations (and was arraigned) in English" in this case, and he "demonstrates ample faculty and responsiveness over the 100 minutes of his recorded interview." Dkt. No. 58 at 9. Furthermore, Manavalan did not use or request an interpreter during his arraignment or the Court's *Daubert* hearing in this case, nor has he requested an interpreter for trial. The Court agrees with the Government that "there is no reason to believe a language barrier meaningfully interfered with his understanding of the clear, repeated admonitions he received." *Id.* Also, when the agents asked Manavalan if he knew what was going on, he explained in his own words— in English—that he did. Dkt. No. 40-4 at 8–9.

Accordingly, Manavalan was not in custody during the interview, and full *Miranda* warnings were not required. The Court thus denies the motion to suppress his interview statements.

    2.  An Evidentiary Hearing Is Not Required

Manavalan requests that the Court grant his motion based on the reasons set forth therein, and "those further reasons that may be stated at an evidentiary hearing." Dkt. No. 40 at 14. The Government responds that an evidentiary hearing is unnecessary because his motion fails even if the Court resolves any factual disputes in his favor. Dkt. No. 58 at 12.

"An evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact" surround the admissibility of the evidence at issue. *United States v. Walczak*, 783 F.2d 852, 857 (9th Cir. 1986). Here, Manavalan's moving papers do not show any factual dispute necessitating an evidentiary hearing. Nor is any factual dispute apparent even when the Government and the Court have construed any disputed facts in Manavalan's favor for purposes of this motion (assuming, for example, that the door to the office was closed during the interview except for the brief moment depicted in the screenshot of the video, Dkt. No. 58 at 2–3).

Finally, as set forth above, if Manavalan is asserting that he was subjected to 90 minutes of accusations of guilt, Dkt. No. 40 at 4—as opposed to a 90-minute interview—that assertion is not supported by any cite to the record, and it is not repeated in his declarations, *see generally* Dkt. Nos. 46, 50–51. Moreover, the assertion is undermined by the audio recording and transcript of the interview, Dkt. Nos. 40-4–40-6, the authenticity of which Manavalan does not dispute. Accordingly, the Court need not hold an evidentiary hearing to explore this unsupported allegation. *See, e.g.*, *United States v. Savanh*, 727 F. App'x 931, 934 (9th Cir. 2018) ("Because the district court could determine from the record before it that [defendant's] allegations of contested factual

1    issues lacked credibility, it did not abuse its discretion in finding an evidentiary hearing

2    unwarranted." (citation modified)). The Court thus declines to hold an evidentiary hearing.

3    **C.    The Court Grants in Part and Denies in Part the Motion Regarding Embedded
         Statements**

4

5            Manavalan moves in the alternative to exclude certain questions from the IRS agents during

6    his June 8, 2021 interview, contending that they are "embedded allegations" and law enforcement

7    opinions of his guilt. Dkt. No. 48 at 1. He argues that the statements are lay opinions that he "is

8    guilty of aiding and assisting in the preparation and presentation of false income tax returns," the

9    statements are not helpful to the jury, and they are unduly prejudicial. *Id.* at 1–2. Specifically,

10   Manavalan seeks to exclude the following questions, Dkt. No. 48 at 2–4:

11           **SA CHRISTOPHER SCHNEIDER:** You would correct that? Okay. So here's the
             thing, Mano. I, what you're telling me, I get what you're telling me, but we have
12           information that shows that I believe you've been increasing expenses that people
             aren't entitled to and taking losses that people aren't entitled to, and that's why
13           we're here today.

     Dkt. No. 48-1 at 2.

14
             **SA JOE LOPEZ:** No. It's just like, you know, it's just like what Chris explained
15           to you, Mano. Now is your time. We just don't show up at people's houses with
             search warrants. We have to, Chris wrote a detailed affidavit explaining all the
16           probable cause that we have that, to explain to the district court judge, the
             magistrate judges of the potential crimes that you've been doing, right? And so
17           that's how we get into your house with these search warrants, and so we just don't
             show up for no reason.
18
             And so we know everything that's being going on over the years, and so this is your
19           opportunity to explain to us, you know, what's going on. And so just like Chris had
             told you, he knows that you've been inflating expenses for your clients. He knows
20           that you've been fabricating Schedule D losses for your clients. Okay. We know
             this already, and so now is your time to help yourself.
21
     *Id.*
22
             **SA JOE LOPEZ:** No. I just want to say that, you know, like I said earlier, we're
23           here for a reason, right? And I fully understand as it, I've never been a tax preparer,
             right? I've interviewed a lot of tax preparers, both as a revenue agent and on the
24           criminal side as a special agent, okay. I fully understand, as a tax preparer, how you
             want to do the best job that you can for your clients, right. And I can fully

understand how easy it would be to, you want to get your clients refunds, right? You want to get their taxes as low as possible for them because that's your job.

And so, I mean, now is the time for you just to tell, if you're preparing your clients' tax returns and throwing on $3,000, you know, Schedule D losses and putting up their expenses just because you felt like you wanted to get them a better refund, you know, I fully understand why you were doing that, you know. But now is the time for you to tell us that's what you're doing. It's going to save everybody a lot of work going forward if you're just honest with us. You know, I fully get it, you know.

Dkt. No. 48-2 at 2.

**SA JOE LOPEZ:** Okay, okay. And so, and just so you understand, Chris is going to go out over the coming months, right? He's going to go out and talk to as many of your clients as possible and show them the tax returns and show, and go through each line item like we kind of, he did with you on your tax returns. And he's going to ask them, you know, the $3,000 loss here that we see, did Mano, Mr. Mano explain to you, or did you explain to him, you know, that you had loans or whatever going over to India, and that's why he put this there? And so we're going to find out.

If you're, I mean, if you're telling us the truth right now, that's great. Then every, all of your clients are going to tell us exactly what you're telling us here, okay. But if you're not telling us the truth, your clients are going to say something totally different, right? And then we're going to come back and say, Mr. Mano, you lied to us.

*Id.* at 3. Manavalan argues that these statements and questions "go beyond providing mere context and contain specific factual assertions about [his] alleged conduct that should be established through admissible evidence, not through agents' questioning tactics." Dkt. No. 63 at 7.

The Government responds that the motion should be denied because "[t]he statements would not be offered for their truth, [so] they are not hearsay," and they provide "important context for Manavalan's responses, which (falsely) deny culpability and narrow his potential defenses at trial." Dkt. No. 58 at 13. The Government argues that in his responses to the disputed questions, Manavalan "scapegoat[ed] his clients for falsified loan losses," and thereby "undermine[d] any other explanation his lawyers might suggest or he might supply" for the allegedly false returns he prepared. *Id.* at 14. The Government further contends that "when the taxpayers . . . deny providing

1    any such information—supposed five- and six-figure loan losses that would be memorable to

2    anyone—the defense will have nowhere to turn." *Id.* It also contends that "Manavalan's denials

3    discuss tax specifics that clearly evince (a) his understanding of the questioning, which he

4    apparently intends to dispute, and (b) a tax sophistication that bolsters the government's showing

5    of willfulness," which constitute "important and permissible" evidence. *Id.* Finally, the

6    Government argues that any resulting prejudice would be minimal, "particularly with a limiting

7    instruction." *Id.*

8         As an initial matter, the Court disagrees with Manavalan that the statements at issue

9    constitute opinions by the agents that he "is guilty of aiding and assisting in the preparation and

10    presentation of false income tax returns." Dkt. No. 48 at 1. In their statements, the agents described

11    what they had found thus far in their investigation, but they did not opine on his ultimate guilt or

12    innocence with respect to a particular charge. Furthermore, as the Government argues, for the most

13    part, the questions provide important context to its theory of the case, to Manavalan's responses,

14    and to willfulness and/or lack of mistake.

15         In *Dubria v. Smith*, the Ninth Circuit rejected a defendant's assertion that the trial court

16    should have excluded a detective's pre-trial comments and questions that "contained statements of

17    disbelief of [defendant's] story, opinions concerning [defendant's] guilt, elaborations of the police

18    theory of [the victim's] death, and references to [defendant's] involvement in the crime." 224 F.3d

19    995, 1001 (9th Cir. 2000). The court noted that "[v]iewed in its entirety, . . . the tape and transcript

20    show . . . an unremarkable interview." *Id.* (citation modified). The court also stated that the

21    detective's questions and comments "placed [defendant's] answers in context, much like a

22    prosecutor's questions at trial." *Id.* The court noted that although "testimony of law enforcement

23    officers often carries an aura of special reliability and trustworthiness," the questions at issue

24    merely "gave context" to defendant's answers. *Id.* at 1001–02 (citation modified).

ORDER DENYING MOTION TO SUPPRESS STATEMENTS TO LAW ENFORCEMENT AND GRANTING IN
PART AND DENYING IN PART MOTION TO EXCLUDE EMBEDDED ALLEGATIONS - 16

1    The same is largely true here. Examining the agents' questions in light of the full interview

2    shows that most of the content of the questions give context to Manavalan's statements. With one

3    exception discussed below, the questions are not the type that "carry any special aura of

4    reliability." *Id.* at 1002. Finally, any assumption jurors might have that they may consider the

5    agents' questions as true statements of fact can be corrected by a limiting instruction. *Id.*

6    (explaining that the jury was instructed not to consider the detective's statements for the truth of

7    the matter and to consider only how they gave meaning to the defendant's answer); *see also United*

8    *States v. Pilisuk*, No. CR22-001TL, 2023 WL 576523, at *5 (W.D. Wash. Jan. 27, 2023) (finding

9    that "any potential prejudice" caused by "a law enforcement officer's questions in a pre-trial

10    interview" "can be cured with a jury instruction").

11        The Court finds otherwise with respect to Agent Lopez's statement that Agent Schneider

12    "wrote a detailed affidavit explaining all the probable cause that we have that, to explain to the

13    district court judge, the magistrate judges of the potential crimes that you've been doing[.]" Dkt.

14    No. 48-1 at 2. The Government does not identify the relevance of the portion of that statement

15    mentioning "the district court judge" and "the magistrate judges," and the Court finds that in the

16    particular circumstances of this case, the portion of the statement referring to judges veers too

17    close for comfort towards vouching. "Vouching" occurs when a government witness improperly

18    attempts to bolster the Government's case by testifying unnecessarily about the strength of the

19    Government's evidence. For example, in *United States v. Cunningham,* 462 F.3d 708 (7th Cir.

20    2006), a government agent testified about the numerous levels of approval required to obtain a

21    wiretap on the defendant's telephone number, including a "very extensive" probable cause

22    affidavit, review by the USAO and a "panel of attorneys" at the DOJ, and then approval by the

23    district court. *Id.* at 710–11. The Seventh Circuit held that this testimony was irrelevant and

24    unfairly prejudicial because the "government witness was improperly vouching for how good the

evidence was," permitting the jury to infer that the defendant was engaged in illegal activity *before* the wiretap because law enforcement, government attorneys, and a district judge each approved it. *Id.* at 713; *see also id.* at 714 ("It is one thing for a government witness, when telling his story to the jury, to say a search warrant had been obtained, and then the search was made"—such information "is simply part of the witness's story"—but "[i]t is quite another thing for a government witness to indicate not only that court authorization for the wiretap had been obtained, but to go on about how various other law enforcement personnel believed there was probable cause to obtain the authorization, and to describe the procedures followed in seeking the authorization."). Citing *Cunningham* with favor, the Ninth Circuit held in *United States v. Brooks* that testimony unnecessarily "discussing at length the process involved in obtaining a wiretap authorization" and "indicat[ing] that many government attorneys and a federal judge had decided that [the defendant] was guilty," improperly bolstered the Government's case. 508 F.3d 1205, 1211 (9th Cir. 2007). Here, the Government has not identified a permissible purpose for indicating that a district judge and "magistrate judges" approved the warrant, so the Court excludes the portion of Agent Lopez's statement referring to judges.

## III.  CONCLUSION

For the foregoing reasons, the Court DENIES Manavalan's motion to suppress all of the statements he made to law enforcement officers on June 8, 2021, Dkt. No. 40, and GRANTS IN PART AND DENIES IN PART his motion to exclude embedded allegations from the interviewing agents, Dkt. No. 48.

Dated this 31st day of December, 2025.

Lauren King
United States District Judge

ORDER DENYING MOTION TO SUPPRESS STATEMENTS TO LAW ENFORCEMENT AND GRANTING IN PART AND DENYING IN PART MOTION TO EXCLUDE EMBEDDED ALLEGATIONS - 18